UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| CASSAUNDRA M. SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:06CV55 TIA |
| | ) | |
| MICHAEL J. ASTRUE,[1] Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**
**OF UNITED STATES MAGISTRATE JUDGE**

This cause is on appeal from an adverse ruling of the Social Security Administration. The parties consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c).

**I.     Procedural History**

On February 12, 2004, Claimant Cassaundra M. Smith filed an application for Supplemental Security Income payments pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, et seq. (Tr. 52-57) and for Disability Insurance Benefits pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401, et seq. (Tr. 104-07).[2] Claimant states that her disability began on August 2, 2003, due to Erb's palsy, carpal tunnel left hand/wrist, and obesity. (Tr. 52-56). On initial consideration, the Social Security Administration denied Claimant's claims

---

[1]Michael J. Astrue became the Commissioner of Social Security on February 12, 2007. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue is substituted for Commissioner Jo Anne Barnhart, as the proper party defendant. See 20 C.F.R. § 422.210(d).

[2]"Tr." refers to the page of the administrative record filed by the defendant with its Answer (Docket No. 11/filed July 10, 2006).

for benefits. (Tr. 32-37, 88-92). Claimant requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 86). On May 16, 2005, a hearing was held before an ALJ. (Tr. 279-311). Claimant testified and was represented by counsel. (Id.). A vocational expert also testified at the hearing. (Tr.301-10). Thereafter, on September 22, 2005, the ALJ issued a decision denying Claimant's claims for benefits. (Tr. 11-21). After considering the additional evidence submitted, the physical examination of Jerome F. Levy, M.D., dated December 4, 2005, the Appeals Council found no basis for changing the ALJ's decision and denied Claimant's request for review of the ALJ's decision on March 29, 2006. (Tr. 5-8). The ALJ's determination thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II.   Evidence Before the ALJ

### A.  Hearing on May 16, 2005

#### 1.  Claimant's Testimony

At the hearing on May 16, 2005, Claimant testified in response to questions posed by the ALJ and counsel. (Tr. 279-311). Claimant's counsel opined that Claimant is disabled due to her Erb's palsy diagnoses in her right arm, because this condition renders her right arm useless, limits her range of motion, and causes weakness, numbness, and frequent bouts of spasms in the right arm. (Tr. 281). Counsel further explained that Claimant has had surgery on both arms as a result of bilateral carpal tunnel syndrome resulting in limiting her ability to lift and pull things. (Tr. 281-82). Counsel indicated that Claimant also experiences frequent spasms approximately ten to fifteen times a day lasting five minutes in duration. (Tr. 282). Claimant's date of birth is July 13, 1970, and at the time of the hearing, Claimant was thirty-four years of age. (Tr. 282). Claimant lives with her husband, Gregory Scott Smith, and two children ages six and seven. (Tr. 283). Her

husband works at Trans Electric doing assembly work. Claimant is a high school graduate. Claimant has received Medicaid for over a year. (Tr. 283). Claimant is left-handed and stands at five-feet four inches and weighs 250 pounds. (Tr. 284).

Claimant testified that she currently works ten hours a week for Clipper Elementary School in the Cape Girardeau District as a playground supervisor. (Tr. 284). In that capacity, Claimant watches children on the playground during recess to enforce the rules and ensure their safety. (Tr. 285). Claimant stands outside during her shift unless it is raining. Claimant works two hours a day from 11:00 a.m. to 1:00 p.m. Claimant started working two months earlier and receives $5.15 per hour. After volunteering at her children's school, the principal approached Claimant and asked if she would like the playground supervisor position. (Tr. 285).

Prior to the playground supervisor job, Claimant last worked in August 2003 at McDonald's in Jackson as a back booth cashier, in other words, a drive through cashier. (Tr. 285-86). Claimant worked a week in that job but left because she experienced problems lifting the boxes in the freezer. (Tr. 286). The boxes were filled with meat and biscuits and weighed around twenty pounds. Stocking the cooler during the employee's free time was part of her job duties as a back booth cashier. (Tr. 286). Claimant testified that when she accepted the position, she thought all her job would only be working as a cashier. (Tr. 287). From March to August 2003, Claimant worked twenty-five to thirty hours a week at McDonald's in Eureka as a drive-through cashier earning $6.50 an hour. (Tr. 287). In that job, Claimant did not have to do any lifting until right before she left due to a move. (Tr. 288). Because of the time of year being slow, her employer wanted Claimant to start doing other duties, pulling items of the freezer and making sandwiches, besides sitting and waiting for customers to arrive. When Claimant moved to Jackson, she

reapplied for the position at McDonald's. Claimant opined that she could possibly do the job of a drive-through cashier so long as she did not have any other job duties. (Tr. 288). Claimant explained it would be harder to work in that capacity at the present time because her right arm is becoming shorter and weaker due to the Erb's palsy. (Tr. 288-89). Claimant testified that this would continue to be the case. (Tr. 289).

In July 2004, a concrete bench lifted by Claimant's niece fell on her foot. (Tr. 298). Claimant was assisting in moving the bench from one location to the next location in her back yard by pushing the bench with her left hand onto a dolly at the time of the accident. (Tr. 299). After the accident, her foot swelled and bruised. (Tr. 300).

On her dominant left side, Claimant has weakness in the left hand from the two carpal tunnel surgeries. (Tr. 290). After the two surgeries, Claimant's left hand is weaker. (Tr. 291). Claimant explained that she had carpal tunnel surgery on her right arm to relieve the numbness and tingling in her right arm. (Tr. 300). After the surgery, Claimant experienced some relief for a period of time, but currently she experiences numbness and tingling. (Tr. 300). Claimant has never been treated by a psychiatrist or a psychologist. (Tr. 291). Claimant has never had any contact with the State Vocational Rehabilitation. (Tr. 289).

Claimant experiences problems with pain mostly in her right arm. (Tr. 291). Claimant testified that she has spasms in her right arm ten to 15 times a day lasting approximately five minutes in duration. (Tr. 291, 294). The spasms started five years earlier. (Tr. 293). Claimant described the spasms like a fluttering or a twitching in the muscles of the whole arm. (Tr. 292). While experiencing a spasm Claimant testified that she is unable to do anything except sit and relax until the spasm passes, because the spasms are distracting to her. (Tr. 294). Claimant has

experienced the spasms and the problems with her right arm since birth, but the spasms have worsened in recent years and her strength has decreased over time. (Tr. 292). Claimant learned to compensate by doing everything with her left arm. (Tr. 292-93).

Claimant experiences constant pain in her right arm and the intensity of the pain has increased over time. (Tr. 297). Claimant explained how the pain is spontaneous and the intensity of the pain increases a couple times during the day. Claimant rated her normal pain at the level of a four on a scale of one to ten with the level increasing to a six or seven when she experiences a spike in the pain. (Tr. 297). Claimant testified that the pain lasts for approximately five minutes in duration and escalates to the point where Claimant cannot do anything. (Tr. 298).

As to her daily activities, Claimant testified that she does the laundry by placing the clothes in the washer and then the dryer, but her husband does the lifting. (Tr. 289). Claimant has a driver's license and drives a vehicle. Claimant goes to the grocery store twice a week. (Tr. 289). Using her left arm and hand, Claimant testified she can lift a gallon of milk but cannot lift a gallon of milk with her right hand. (Tr. 290). Claimant does not smoke or use alcohol. (Tr. 290). Claimant cooks, but her husbands assists by placing and removing items from the oven, taking pots off the stove, and draining pots. (Tr. 290, 294). Claimant's husband washes the pots and pans, and Claimant loads and unloads the dishwasher. (Tr. 290). Claimant testified that she cannot use two hands at once. (Tr. 291). Claimant testified that she has never traveled more than 100 miles from her home. (Tr. 291). Claimant testified that she could remove a cap and ball from a shelf about a foot over her head with her left hand but not her right hand. (Tr. 293). Claimant has problems with her self care inasmuch as she can only use her left hand so she cannot reach parts of her body. (Tr. 294-95). Claimant cannot shave her legs or under her arms. (Tr. 295). Claimant

purchased a hair dryer stand to assist her in drying her hair so that Claimant can dry her hair without holding the dryer. (Tr. 295). Claimant has problems getting dressed. (Tr. 296). Her husband assists her in putting on undergarments, shorts, and pants. Claimant testified that she could not pick up her children when they were younger, and she had problems changing their diapers, feeding them, and getting them out of a crib. (Tr. 296).

### 2. Testimony of Vocational Expert

Vocational Expert Gary Weimholt, M.S., CDMS,[3] classified Claimant's past relevant work as a daycare worker, a semiskilled job usually at the light physical demand level and described by Claimant to be the same. (Tr. 301-02). Mr. Weimholt testified that Claimant also worked as a hostess at a restaurant, a semiskilled job at the light physical demand level with no lifting requirements beyond lifting small objects or serving coffee. (Tr. 302). Mr. Weimholt testified that Claimant worked as a department store cashier and a convenience store cashier for several employers, an unskilled, typically at the light physical demand level with lifting requirements of less than ten pounds. Mr. Weimholt testified that Claimant also worked at a pharmaceutical packing job where she would sit and stand and watch and check packaging and remove from the line any packages not properly packaged. (Tr. 302). Mr. Weimholt testified that Claimant worked as a donut maker in a grocery store classified as a medium, semiskilled job with lifting requirements included moving heavy trays. (Tr. 303-04). Mr. Weimholt testified that Claimant also worked as a cashier in a fast food store in the drive-through booth, and this job would fall into the same category as the other cashiering jobs. (Tr. 304).

---

[3]"CDMS." is the abbreviation for a certified disability management specialist. (Tr. 34).

The ALJ asked Mr. Weimholt to assume that:

> we have a hypothetical individual of the age, education and work experience of the Claimant who has, for RFC number one, the ability to occasionally lift and carry up to 20 pounds, frequently lift and carry 10 pounds; who can sit, stand, or walk for about six hours each over the course of an eight-hour day with customary breaks; and who is restricted to a one, one-armed, on-handed[*sic*] work with the dominant left upper extremity. Okay. The second hypothetical is going to be exactly the same, but I'm going to cut the weight limit down to 10 pounds. Okay. Let's start with the first hypothetical. Could any of the past work that you've identified be performed either as the, the[*sic*] Claimant performed it, or as it's customarily performed?

(Tr. 304). Mr. Weimholt opined that such an individual would not be able to work such jobs, with the possible exception of the pharmaceutical job, because the jobs required the use of both hands. (Tr. 304-05). The ALJ concluded that Claimant would be precluded from performing any past relevant work based on Mr. Weimholt's response. (Tr. 305). With respect to hypothetical number two with the additional weight restriction, Mr. Weimholt opined that Claimant would still be precluded from performing any past relevant work based on Mr. Weimholt's opinion.

The ALJ then asked Mr. Weimholt to return to hypothetical number one and asked if "other work [could] be done by a hypothetical at the age, education, and the work experience of Mrs. Smith, who has such limitations." (Tr. 305). Mr. Weimholt opined as follows:

> There are some jobs. They would come under the title of a museum attendant. In the State economy there, there[sic] would be approximately 500 of those jobs, 25,000 nationally. A similar job is an information clerk. In the State economy there would be approximately 1,000, 50,000 nationally. There would be also some jobs as a usher. Those that are SGA, there would be approximately 500 in the State economy, 25,000 nationally. And then I think those jobs would also apply to hypothetical number two. And then there would also be a small number of surveillance system monitors that would also apply to number two. And there would be approximately 500 in the local economy and 25,000 nationally.

(Tr. 305-06). The ALJ clarified that there would be 500 surveillance system monitor jobs in Missouri, and those jobs would apply to the first and second hypothetical. (Tr. 306). Mr. Weimholt cited museums in St. Louis and the Science Center as examples of where museum attendants are located. Mr. Weimholt compared a museum attendant to an usher because in both positions you give directions and pass out information as well as having a security function although they are not armed or expected to detain people. (Tr. 306). Mr. Weimholt explained that information clerks would be found at some large office centers and/or buildings and certain entertainment areas such as Branson, and the clerks would provide tourist information to people. (Tr. 306-07). Basically the duties of an information clerk would be to disseminate information to people entering a building with some security functions such as observing monitors. (Tr. 307). Unlike an unarmed security guard, an information clerk would not have to make rounds or detain anyone. Mr. Weimholt explained that a hotel concierge would be a similar job. Mr. Weimholt indicated that full-time usher positions would be located in some theaters. (Tr. 307).

In response to counsel's query asking whether the museum clerk or the information clerk jobs required any kind of computer skills, Mr. Weimholt opined that the jobs should not. (Tr. 308). Mr. Weimholt acknowledged that there would not be either museum attendant or information clerk positions on a regular basis in the Cape Girardeau area. Mr. Weimholt explained that Branson would be a good example of where there would be office centers and buildings with information clerk positions. Mr. Weimholt further opined that there would be a few information clerk positions in the area where Claimant resides. (Tr. 308). Mr. Weimholt agreed that the surveillance system monitor position might require occasionally typing a report and other additional duties. (Tr. 308-09). In response to counsel's question about whether a person with

one arm would be able to complete limited typing, Mr. Weimholt opined that such typing duties would have to be very limited.  (Tr. 309).

Next, counsel asked Mr. Weimholt to assume that the hypothetical person has spasms ten to fifteen times a day lasting up to five minutes in duration and bothersome enough to force the individual to take a break.  (Tr. 309).  In response to the question whether that individual would be employable in any of the positions he had discussed, Mr. Weimholt opined that he would not consider such individual compatible for regular employment if the spasms were chronic and ongoing thereby requiring the individual to take additional breaks of ten to fifteen minutes.  (Tr. 309).  Mr. Weimholt further opined that if the individual had chronic and habitual spasms requiring taking an additional fifteen minute break each day, this additional break requirement would interfere with regular work performance.  (Tr. 310).  Further, he opined that if the individual had to sit down a couple times of day due to the spike pain in her shoulder, the individual would be less likely employable.  Mr. Weimholt confirmed that there are 1,000 information clerk positions in the State of Missouri in response to counsel's question.  (Tr. 310).

### 3.  Open Record

During the hearing and at the request of counsel, the ALJ determined that the record would be held open for thirty days so that Claimant's counsel could submit updated records from Claimant's treating family physician, Dr. Compton.  (Tr. 281).  At the conclusion of the hearing, the ALJ stated on the record that he would place the case in post-development status to allow counsel to submit the updated records from Dr. Compton.  (Tr. 310).  A review of the record shows that counsel timely submitted additional evidence from Dr. Compton to the ALJ before he issued a decision denying Claimant's claims for benefits as directed by the ALJ.  (Tr. 271-73).

### 4. Forms Completed by Claimant

In the Report of Contact, Claimant reported that she is a housewife and that her Erb's palsy prevents her from working. (Tr. 140). Claimant explained that her arm is "basically 'dead'" and of little to no use. Claimant reported being diagnosed with Erb's palsy since birth, and she receives no treatment inasmuch as the doctors do not know about her impairment or how to treat the same. (Tr. 140).

In response to questions set forth in a questionnaire dated March 9, 2004, Claimant indicated that she is not working due to Erb's palsy and problems with her arm, wrist, and hand. (Tr. 141). The symptoms precluding her from working are muscle spasms and weakness, inability to raise right arm upward, inability to turn wrist over, no strength in right arm, and pain in arm and neck. Claimant explained that she cannot take muscle relaxers because they make her sleepy and would preclude her from caring for her children. (Tr. 141). Claimant indicated that she takes care of her spouse and children by dressing the children, cooking, bathing, and taking care of their needs. (Tr. 142). In particular, Claimant listed having the ability to do the following household tasks: laundry, dishes, make beds/change sheets, vacuum/sweep, take out trash, and errands such as banking and going to the post office. Claimant indicated that mowing the lawn and raking leaves require too much raising of her arm for her to complete the tasks. As examples of how her activities have changed since she had become unable to work, Claimant cited how she has problems taking items out of the oven and opening jars, sleeping due to pain, grooming, and dressing. (Tr. 144). Claimant explained how all of her life she has had to complete all tasks with her left hand only and as she has aged, she has experienced more difficulties than before. (Tr. 145).

In the Work Activity Report dated February 12, 2004, Claimant indicated that she had to leave her cashier positions at Burger King and McDonalds due to her medical condition. (Tr. 146-52).

In the Work History Report, Claimant listed working at a childcare center, restaurants, department stores, convenience stores, a grocery store, and a factory. (Tr. 153). Claimant worked as either a cashier, childcare worker, and a shelf stocker with her earnings ranging from $3.85 to $7.00 an hour. (Tr. 154-63).

In the Disability Report Adult, Claimant indicated that she has a medical assistance card. (Tr. 166). Claimant listed Erb's palsy muscle spasms in her right arm, wrist, and hand, pain, and reoccurrence of carpal tunnel in her left hand and wrist as the conditions limiting her ability to work, because she is unable to lift anything with her right arm and turn over her wrist. (Tr. 167). Claimant indicated that although she has had Erb's palsy since birth, the condition has progressively worsened over time. Claimant worked after the date she alleged to have become disabled by working fewer hours and changing her job duties. Claimant stopped working on January 4, 2004, due to the muscle spasms and pain limiting her. (Tr. 167). Claimant worked the longest as a cashier and in that capacity she operated a cash register, stocked coolers and shelves, cleaned shelves, and emptied trash cans. (Tr. 168).

### III. Medical Records

In the hospital record dated July 13, 1970, there is a notation of "brachial plexus injury - rt palsy (Erbs)." (Tr. 177). In the Newborn Order Sheet from Saint Anthony's Hospital, the doctor ordered a neurologic consultation for brachial plexus injury. (Tr. 178). The x-ray report dated July 14, 1970, revealed no fracture, dislocation, bone destruction, or abnormal bone production

and the radiologist concluded normal shoulder girdles. (Tr. 187). The x-ray report of Claimant's cervical spine dated July 18, 1970, revealed cervical spine to be within normal limits. (Tr. 189).

On July 7, 1999, Dr. Rodney Routsong performed left carpal tunnel release surgery for median nerve decompression at Des Peres Hospital. (Tr. 191-96). Numbing and tingling starting two years earlier were listed as Claimant's chief complaint. (Tr. 196). Dr. Routsong opined that Claimant's prognosis was good for the procedure. (Tr. 193).

In the emergency room at Saint Francis Medical Center on June 30, 2002, Claimant reported right lower leg pain due to a fall. (Tr. 236). The x-ray of Claimants' right ankle revealed the ankle to be within normal limits. (Tr. 234). The x-ray of Claimant's right knee revealed the knee to be within normal limits. (Tr. 235).

In a treatment note dated October 21, 2003, from Heartland Family Physicians, Claimant reported some pain and muscle spasm in the right arm. (Tr. 215, 251). Examination revealed no acute distress. After examination, Dr. Christopher Compton diagnosed Claimant with right brachial plexus palsy and referred Claimant to a neurologist for treatment. Dr. Compton prescribed Skelaxin for muscle spasms and Darvocet. Dr. Compton also recommended some weight loss. (Tr. 215, 251). In a return visit on November 7, 2003, Claimant reported hurting her left ankle after falling down the stairs the night before. (Tr. 250). Dr. Compton diagnosed Claimant with ankle strain and prescribed rest and wrapped her ankle in an Ace wrap. (Tr. 250).

On referral by Dr. Compton, Dr. Steven Mellies evaluated Claimant for possible return of left carpal tunnel syndrome and spasms in right shoulder on December 31, 2003. (Tr. 197). Dr. Mellies noted that Claimant has an old brachial plexus lesion which occurred at birth. Claimant reported feeling better after the release surgery, but for the last year, she has been wearing a brace

again. Claimant reported numbness to the index, middle and ring finger and spasms occurring two to three times a day in the right shoulder area, particularly around the deltoid and scapular region. Claimant tried therapy in the past without much benefit. Claimant reported smoking a half package of cigarettes a day. (Tr. 197). Examination revealed moderate weakness of the right shoulder and weakness to lateral rotation of the shoulder. (Tr. 198). Dr. Mellies noted Claimant's wrist extension to be mildly weak and positive Tinel's sign over both wrists. Dr. Mellies determined that Claimant most likely has bilateral carpal tunnel syndrome and upper brachial plexus injury since birth with recent spasms. Dr. Mellies ordered a nerve conduction study of both median nerves. (Tr. 198). The nerve conduction studies completed on January 21, 2004, revealed both median nerves consistent with bilateral carpal tunnel syndrome with findings worse on left wrist. (Tr. 199).

In the initial evaluation at Midwest Physicians and Surgeons Plastic and Hand Surgery on February 4, 2004, Claimant reported carpal tunnel and hand numbness with improvement one year after surgery. (Tr. 214). Dr. Mellies referred Claimant for treatment for left carpal tunnel syndrome. (Tr. 213). Claimant indicated that she has Erb's palsy of the right arm since birth. (Tr. 214). Claimant has smoked a half of package of cigarettes for seventeen years. Claimant reported taking Prevacid and Estradiol. (Tr. 214). Claimant has experienced symptoms of numbness and tingling in her left hand with some improvement by wearing splints at night. (Tr. 213). Claimant underwent left carpal tunnel release in 2000 and experienced immediate improvement in symptoms lasting for one year after surgery with symptoms becoming worse over time. Dr. Gladys Tsao-Wu noted Claimant's past medical history is significant for obesity. Examination revealed a full range of motion and Claimant's right upper extremity affected by Erb's palsy since birth. Examination of

left wrist revealed negative Tinel's positive pressure, positive Phalen's and negative symptoms in the ulnar cubital tunnel. Dr. Tsao-Wu noted that the nerve conduction studies completed by Dr. Mellies showed significant increase in latency in the left median nerve. Dr. Tsao-Wu found that Claimant has symptoms consistent with carpal tunnel syndrome on the left and asymptomatic on the right side. Dr. Tsao-Wu determined to schedule a redo carpal tunnel release on the left side under general anesthesia. (Tr. 213).

Claimant returned to the Heartland Family Physicians on February 11, 2004, for treatment of bladder infection symptoms. (Tr. 249). Dr. Compton prescribed Cipro. (Tr. 249). On February 24, 2004, Claimant returned and reported left ear pain and facial pressure with some nasal drainage for the last week. (Tr. 248). Dr. Compton diagnosed Claimant with a sinus infection and prescribed Septra. (Tr. 248).

On March 1, 2004, Dr. Tsao-Wu's performed left carpal tunnel syndrome release on Claimant. (Tr. 211). Claimant reported symptoms consistent with left carpal tunnel syndrome for years and having had a procedure one year earlier with no relief. (Tr. 211). Dr. Tsao-Wu noted that Claimant's median nerve to be compressed with an hour-glass type configuration. (Tr. 212). Claimant tolerated the procedure well. (Tr. 212). In a follow-up visit after left carpal tunnel release, Claimant reported feeling better and improved sensation in her fingers. (Tr. 210). Dr. Tsao-Wu recommended Claimant to perform active and passive range of motion exercises on her fingers. (Tr. 210).

On March 9, 2004, Claimant returned to the Heartland Family Physicians reporting left ear pain and cough. (Tr. 248). Examination revealed ears to be normal. Dr. Compton prescribed Avelox for Claimant's cough and Pancoff for ear pain. Claimant returned on March 18, 2004,

complaining of continued ear pain. Dr. Compton order a CT scan of Claimant's ear without contrast to rule out possibly mass or tumor. Dr. Compton opined that if Claimant continues to have ear pain, Claimant will be referred to ENT.

On March 12, 2004, in a post-op follow-up visit with Dr. Tsao-Wu, Claimant reported improved sensation in her left fingers but pain in left thumb and weakness in her left hand. (Tr. 209). Examination revealed Claimant's wounds to be healing well and a good range of motion of her fingers and wrist. Dr. Tsao-Wu gave Claimant a gel splint so that she would start using the hand more regularly. Claimant reported similar symptoms in her right hand. Dr. Tsao-Wu scheduled Claimant to return for evaluation of right carpal tunnel. (Tr. 209).

On March 25, 2004, Claimant received treatment at Saint Francis Medical Center for left ear pain and headaches. (Tr. 230-31). The CT examination temporal bones with attention internal auditory canals revealed few small air cells in the superior right mastoid with decreased pneumatization. (Tr. 232). The CT examination of Claimant's head revealed no acute intracranial pathology and non pneumatization of the left frontal sinus to be in normal anatomic variation. (Tr. 233).

On April 2, 2004, Claimant called and reported continued ear pain to the Heartland Family Physicians. (Tr. 248). Dr. Compton referred Claimant to Dr. Seabaugh, an ENT, for an appointment on April 14, 2004. (Tr. 248).

On April 7, 2004, in a follow-up visit with Dr. Tsao-Wu, Claimant reported no longer experiencing numbness in her left hand but experiencing similar symptoms, including numbness, in her right hand. (Tr. 208). Wearing a splint on the right side makes her symptoms worse. Dr. Tsao-Wu determined to schedule carpal tunnel release on the right side. (Tr. 208). On April 19,

2004, Dr. Tsao-Wu performed right carpal tunnel release at Auburn Surgery Center. (Tr. 206). Dr. Tsao-Wu noted that Claimant tolerated the procedure well. (Tr. 207). In a follow-up visit, Claimant reported no complaints since surgery and improvement of the numbness in the fingertips. (Tr. 205). Examination revealed a good range of motion of her hand, wrist, and fingers. (Tr. 205). On May 5, 2004, Claimant reported no particular complaints and the numbness in her fingers had significantly improved. (Tr. 204). In a follow-up visit on May 26, 2004, Claimant reported no reoccurrence of the numbness in her fingers but she has a little bit of weakness in the left hand and some tenderness. (Tr. 203). Dr. Tsao-Wu instructed Claimant to follow-up as needed. (Tr. 203).

In the Physical Residual Functional Capacity Assessment completed on June 28, 2004, Dr. Donald Edwards, listed upper brachial plexus palsy as Claimant's primary diagnosis and bilateral CTS, post op, obesity, as Claimant's secondary diagnosis. (Tr. 122). Dr. Edwards reviewed Claimant's medical records for the purpose of assessing Claimant's physical residual capacity. Dr. Edwards indicated that Claimant's exertional limitations included that Claimant could occasionally lift twenty pounds; could frequently lift ten pounds; could stand or walk about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; and was limited in upper extremities. (Tr. 123). Dr. Edwards noted that Claimant alleges disability due to paralysis of right upper arm since birth. Claimant's medical records reveal that she has had carpal tunnel release surgery in both hands recently, spasms in her right arm and difficulty lifting heavy objects with her left arm, but she is able to drive, do household chores and shop, care for her children, and leave home often. Further, Claimant's right upper paralysis and MDI of upper brachial palsy are well documented. (Tr. 123, 127). Pushing/pulling are not possible due to Claimant's paralysis. (Tr.

123). Claimant's medical records further reveal that she has had Erb's palsy since birth, left CTS surgery in July, 1999, and March, 2004 and right CTS surgery in March, 2004, with this surgery described as successful and symptoms resolved. (Tr. 123). Dr. Edwards indicated that Claimant's postural limitations included that Claimant could never crawl or balance due to Claimant's right upper extremities paralysis and frequently climb ramps/stairs, stoop, kneel, and crouch. (Tr. 124). Dr. Edwards further indicated that Claimant has an established manipulative limitation in overhead reaching in right upper extremities only due to paralysis and no established visual limitations. (Tr. 125). With respect to communicative and environmental limitations, Dr. Bowman found none to be established. (Tr. 126). Based on his thorough review of the medical records, Dr. Edwards opined that Claimant's symptoms are fully credible and despite that her Erb's palsy has been present since birth, Claimant "has done well." (Tr. 127).

On July 20, 2004, Claimant received treatment in the emergency room at Saint Francis Medical Center after dropping a concrete bench on her right foot. (Tr. 220-29). In the Clinical Impression section, the treating doctor found Claimant to have a contusion and abrasion of the right foot and treated Claimant by prescribing a post-op shoe. (Tr. 223). The x-ray of the right foot revealed no evidence of fracture or dislocation. (Tr. 226).

On July 29, 2004, in an office visit with Dr. Mellies, Claimant reported seeing a plastic surgeon for bilateral carpal tunnel release. (Tr. 253). Claimant indicated that the procedures helped both of her hands but that she now has problems lifting her right arm stemming from birth injury. Claimant reported being unable to work outside the home. Claimant indicated that she applied for disability but was denied without being evaluated by a physician. Examination

revealed that Claimant cannot handle two-handed loads. Dr. Mellies opined that Claimant's right arm would limit her ability to do lifting and has limited her ability to do house work. (Tr. 253).

On September 28, 2004, Claimant returned to the Heartland Family Physicians as follow-up for right foot injury. (Tr. 247). Claimant reported continued pain and swelling. Examination revealed slight swelling and bruising and tenderness. Dr. Compton requested a repeat x-ray to rule out fracture. Claimant returned on October 4, 2004, for treatment of a rash. Doctor Compton prescribed Hydrocortisone cream. (Tr. 247). On October 23 and 27, 2004, Claimant received treatment for a cough and sinus problems. (Tr. 244-46). Doctor Compton diagnosed Claimant with bronchitis and prescribed medication. (Tr. 243).

On January 26, 2005, Claimant returned to the Heartland Family Physicians reporting congestion and sinus drainage. (Tr. 242). Dr. Compton diagnosed Claimant with bronchitis and prescribed medication. (Tr. 241-42).

On February 8, 2005, Claimant reported chronic right upper arm weakness and shoulder pain to the emergency room doctor at Crosstrails Medical Center. (Tr. 256). Claimant reported seeing Dr. Mellies who determined that nothing can be done to assist Claimant from his perspective. It is noted that "'Lawyer sent me here' - disability to see if I can do anything for her." (Tr. 256). Established Erb's palsy since birth is listed as Claimant's chief complaint. (Tr. 256). Dr. John Hartman ordered an x-ray of Claimant's cervical spine and to keep follow-up visit with Dr. Compton as scheduled. (Tr. 257). The x-ray of Claimant's cervical spine revealed no evidence of a fracture or subluxation involving the cervical spine and a "small focal calcification in the region of the anterior longitudinal ligament anterior to the C4-5 vertebral bodies." (Tr. 258).

On February 25, 2005, Dr. Compton prescribed physical therapy as treatment for

Claimant's Erb's palsy and right arm pain.  (Tr. 270).  In the initial evaluation at Saint Francis Medical Center, Joel Sander, a clinician, noted Claimant's diagnosis of right shoulder sprain and arm numbness.  (Tr. 265).  Claimant reported shoulder range of motion and function gradually worsening over time.  (Tr. 265).  In the assessment, Mr. Sander opined that Claimant's overall rehabilitation potential to be fair and listed Claimant's rehab goals to be decrease pain, improve loss of motion/stiffness, improve shoulder range of motion, and increase strength.  (Tr. 266-67).  Mr. Sander noted that Claimant tolerated the treatment with minimal complaints of pain and difficulty.  (Tr. 268).  On March 25, 2005, Mr. Sander discharged Claimant from physical therapy finding that Claimant is unable to achieve therapy goals.  (Tr. 263-64).  Claimant reported increased pain with exercise and no functional improvements.  (Tr. 263).

On March 10, 2005, Claimant sought treatment at Saint Francis Medical Center for right shoulder pain and Erb's palsy.  (Tr. 262).

On April 26, 2005, Claimant returned to Heartland Family Physicians for treatment of right arm pain.  (Tr. 272). Examination of Claimant's upper extremity revealed limited range of motion especially with overhead movements with her right arm but good strength, sensation, and reflexes in both arms.  Dr. Compton recommended that Claimant be evaluated at the pain clinic.  Claimant agreed to the treatment plan.  (Tr. 272).

On referral from Claimant's counsel, Dr. Jerome Levy evaluated Claimant "with regard to trauma sustained over a period of time while she was employed as a cashier for a McDonalds." (Tr. 274).  In the present history, Dr. Levy outlined the accident as outlined by Claimant as follows:

This lady began working at McDonalds a number of years ago and evidently was

terminated in August 2003 and since has also worked at a convenience store. She
started noticing several years ago while working at McDonalds that she was
developing numbness and tingling in both of her hands, worse on the left than on
the right. Eventually she sought medical attention and surgery was recommended.
She had had a left carpal tunnel release in 2000 and had another left carpal tunnel
release on March 1, 2004. She had a right carpal tunnel release on April 19, 2004.
She states that the latter two operations have helped somewhat.

She did not miss work but now has gone to an easier job that is less hand intensive
as a playground supervisor for an elementary school.

(Tr. 274).

Claimant reported her right shoulder injury at birth and a history of Erb's palsy with
limited use of her right arm. (Tr. 274). Claimant reported that the numbness and the tingling are
gone, but she has occasional pain. (Tr. 274). Dr. Levy limited his physical examination to
Claimant's upper extremities. (Tr. 275). Examination revealed a frozen right shoulder and limited
use of the right upper extremity proximally with spotty numbness. (Tr. 276). Dr. Levy listed as
diagnosis: Erb's palsy right upper extremity, frozen right shoulder, status post bilateral carpal
tunnel releases, and chronic strain in both hands. (Tr. 276). In his conclusion, Dr. Levy opined
that Claimant has permanent partial disability[4] as a result of the work related hand intensive
activities as follows:

Thirty percent (30%) of the left upper extremity at the wrist

Twenty percent (20%) of the right upper extremity at the wrist

---

[4]A treating physician's opinion that a claimant is not able to return to work "involves an issue
reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the
Commissioner gives controlling weight." Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005).

(Tr. 276). Dr. Levy further opined that Claimant has "permanent partial disability pre-existing the above trauma and was and is a hindrance and obstacle to employment and to re-employment should she become unemployed" as follows:

Eighty percent (80%) of the right upper extremity at the shoulder

(Tr. 277). Dr. Levy determined that '[t]he combination of the impairments creates a greater disability than the simple total of each and a loading factor should be added." (Tr. 277). Dr. Levy recommended that Claimant be evaluated by a vocational expert to determine from an educational and vocational viewpoint whether Claimant is employable on the open labor market considering she "would have to work with minimal use of the right upper extremity and decreased use of the left." (Tr. 277).

## IV.    The ALJ's Decision

The ALJ found that Claimant met the disability insured status requirements on August 2, 2003, the date she alleged she became unable to work and continued to meet the requirements through December, 2004. (Tr. 19). The ALJ found that Claimant has not engaged in substantial gainful activity since the alleged onset date of disability. The ALJ found that the medical evidence establishes that Claimant has right shoulder strain, right arm palsy, and bilateral carpal tunnel syndrome, status-post surgery for release, but no impairment or combination of impairments that meets or equals in severity the requirements of any impairment set forth Appendix 1, Subpart P, Regulations No. 4. The ALJ found that Claimant's allegations of disabling symptoms precluding all substantial gainful activity are not consistent with the evidence and are not credible. The ALJ further found that Claimant has the residual functional capacity to perform work except for work involving frequently lifting over ten pounds or occasionally lifting over twenty pounds. (Tr. 19).

The ALJ determined that Claimant is able to sit for at least six hours in an eight-hour workday and able to stand and walk for six hours in an eight-hour workday. (Tr. 19-20). The only exertional or nonexertional limitation is that Claimant is only able to use one of her arms to perform work activities. (Tr. 20). The ALJ determined that Claimant is unable to perform her past relevant work, but that Claimant has the residual functional capacity to perform a wide range of light work. (Tr. 20).

Considering Claimant's impairment established in the instant case, age, education, work experience, and residual functional capacity, the ALJ opined based on the vocational expert testimony that Claimant is not disabled. (Tr. 2)). The ALJ cited how the vocational expert identified a significant number of jobs that a hypothetical individual with Claimant's vocational factors and residual functional capacity could perform. The ALJ thus concluded that Claimant is not under a disability. (Tr. 20).

**V.    Discussion**

In a  disability insurance benefits case, the burden is on the claimant to prove that he or she has a disability. <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001). Under the Social Security Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). Additionally, the claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists

in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B); <u>see also</u> <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140 (1987).

The Commissioner has promulgated regulations outlining a five-step process to guide an ALJ in determining whether an individual is disabled.  First, the ALJ must determine whether the individual is engaged in "substantial gainful activity."  If she is, then she is not eligible for disability benefits.  20 C.F.R. § 404. 1520(b).  If she is not, the ALJ must consider step two which asks whether the individual has a "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  If the claimant is not found to have a severe impairment, she is not eligible for disability benefits.  If the claimant is found to have a severe impairment the ALJ proceeds to step three in which he must determine whether the impairment meets or is equal to one determined by the Commissioner to be conclusively disabling.  If the impairment is specifically listed or is equal to a listed impairment, the claimant will be found disabled.  20 C.F.R. § 404.1520(d).  If the impairment is not listed or is not the equivalent of a listed impairment, the ALJ moves on to step four which asks whether the claimant is capable of doing past relevant work.  If the claimant can still perform past work, she is not disabled.  20 C.F.R. § 404.1520(e).  If the claimant cannot perform past work, the ALJ proceeds to step five in which the ALJ determines whether the claimant is capable of performing other work in the national economy.  In step five, the ALJ must consider the claimant's "age, education, and past work experience."  Only if a claimant is found incapable of performing other work in the national economy will she be found disabled.  20 C.F.R. § 404.1520(f); <u>see also</u> <u>Bowen</u>, 482 U.S. at 140-41 (explaining five-step process).

Court review of an ALJ's disability determination is narrow; the ALJ's findings will be affirmed if they are supported by "substantial evidence on the record as a whole." Pearsall, 274 F.3d at 1217. Substantial evidence has been defined as "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Id. The court's review "is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision, we also take into account whatever in the record fairly detracts from that decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The Court will affirm the Commissioner's decision as long as there is substantial evidence in the record to support his findings, regardless of whether substantial evidence exists to support a different conclusion. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).

In reviewing the Commissioner's decision, the Court must review the entire administrative record and consider:

1.    The credibility findings made by the ALJ.

2.    The claimant's vocational factors.

3.    The medical evidence from treating and consulting physicians.

4.    The claimant's subjective complaints relating to exertional and non-exertional activities and impairments.

5.    Any corroboration by third parties of the claimant's impairments.

6.    The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

Claimant argues that the ALJ's decision is not supported by substantial evidence on the record as a whole, because the ALJ erred in evaluating Claimant's credibility by discrediting her testimony and determining a residual functional capacity not based upon all of the medical evidence.

A.  Credibility Determination

The determination of Claimant's credibility is for the Commissioner, and not the Court, to decide.  Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987).  The ALJ may not discredit Claimant's complaints of pain solely because they are unsupported by objective medical evidence. O'Donnell v. Barnhart, 318 F.3d 811, 816 (8th Cir. 2003); Jones v. Chater, 86 F.3d 823, 826 (8th Cir. 1996); Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted). Instead, the ALJ must also consider all of the evidence relating to the Claimant's prior work history, the absence of objective medical evidence to support the complaints, and third party observations as to:

1.  claimant's daily activities;

2.  duration, frequency and intensity of the pain;

3.  precipitating and aggravating factors;

4.  dosage, effectiveness and side effects of medication;

5.  functional restrictions.

Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001) (stating factors from Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)).  The ALJ may disbelieve the claimant's subjective complaints "if there are inconsistencies in the evidence as a whole." Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004).

The undersigned recognizes that pain itself may be disabling. See Loving v. Department of Health & Human Servs., 16 F.3d 967, 970 (8th Cir. 1994). However, "the mere fact that working may cause pain or discomfort does not mandate a finding of disability." Jones, 86 F.3d at 826. "[T]he real issue is how severe the pain is." Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993) (quoting Thomas v. Sullivan, 928 F.2d 255, 259 (8th Cir. 1991)). While there is no doubt that claimant experiences pain, the more important question is how severe the pain is. Gowell, 242 F.3d at 796.

When determining a claimant's complaints of pain, the ALJ may disbelieve such complaints if there are inconsistencies in the evidence as a whole. Polaski, 739 F.2d at 1322. The ALJ must make express credibility determinations detailing the inconsistencies in the record that support the discrediting of the claimant's subjective complaints. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000); see also Johnson v. Secretary of Health and Human Servs., 872 F.2d 810, 813 (8th Cir. 1989). "An ALJ must do more than rely on the mere invocation of Polaski to insure safe passage for his or her decision through the course of appellate review." Harris v. Shalala, 45 F.3d 1190, 1193 (8th Cir. 1995). Where an ALJ explicitly considers the Polaski factors but then discredits a claimant's complaints for good reason, his decision should be upheld. Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992). However, the Eighth Circuit has held that an ALJ is not required to discuss each Polaski factor methodically. Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1966). The ALJ's analysis will be accepted as long as the opinion reflects acknowledgment and consideration of the factors before discounting the claimant's subjective complaints. Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000); see also Brown, 87 F.3d at 966. The ALJ's credibility findings are entitled to deference if the findings are supported by multiple valid reasons. See Goff v. Barnhart,

421 F.3d 785, 791-92 (8th Cir. 2005); Gregg v. Barnhart, 354 F.3d 710, 714 (8th Cir. 2003) (if ALJ explicitly discredits claimant and gives good reasons for doing so, court will normally defer to credibility determination).

In his decision the ALJ thoroughly discussed the medical evidence of record, the lack of ongoing medical evidence corroborating Claimant's subjective complaints of functional limitations, the lack of prescription pain medications, Claimant's history of low earnings, and the testimony adduced at the hearing. See Gray v. Apfel, 192 F.3d 799, 803-04 (8th Cir. 1999) (ALJ properly discredited claimant's subjective complaints of pain based on discrepancy between complaints and medical evidence, inconsistent statements, lack of pain medications, and extensive daily activities). The lack of objective medical basis to support Claimant's subjective descriptions is an important factor the ALJ should consider when evaluating those complaints. See Stephens v. Shalala, 50 F.3d 538, 541 (8th Cir. 1995) (lack of objective findings to support pain is strong evidence of lack of a severe impairment); Barrett v. Shalala, 38 F.3d 1019, 1022 (8th Cir. 1994) (the ALJ was entitled to find that the absence of an objective medical basis to support claimant's subjective complaints was an important factor in evaluating the credibility of her testimony and of her complaints). The ALJ then addressed several inconsistencies in the record to support his conclusion that Claimant's complaints were not credible.

Specifically, the ALJ noted that no treating physician in any treatment notes stated that Claimant was disabled or unable to work. See Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000) (significant that no examining physician submitted medical conclusion that claimant is disabled or unable to work); Edwards v. Secretary of Health & Human Servs., 809 F.2d 506, 508 (8th Cir. 1987) (examining physician's failure to find disability a factor in discrediting subjective

complaints). The lack of objective medical basis to support Claimant's subjective descriptions is an important factor the ALJ should consider when evaluating those complaints. See Stephens v. Shalala, 50 F.3d 538, 541 (8th Cir. 1995)(lack of objective findings to support pain is strong evidence of lack of a severe impairment); Barrett v. Shalala, 38 F.3d 1019, 1022 (8th Cir. 1994)(the ALJ was entitled to find that the absence of an objective medical basis to support claimant's subjective complaints was an important factor in evaluating the credibility of her testimony and of her complaints). In addition, the ALJ noted that no physician had ever made any medically necessary restrictions, restrictions on her daily activities, or functional or physical limitations. Indeed, the ALJ noted how Claimant's history of relatively low earnings detracts from her credibility. See Comstock v. Chater, 91 F.3d 1143, 1147 (8th Cir. 1996) (finding that claimant's prior work history characterized by fairly low earnings and significant breaks in employment casts doubt on the claimant's credibility). Further, the ALJ noted that despite her allegations of persistent numbness and tingling in her hands, Claimant has not received ongoing medical attention or treatment for her upper extremities after recovering from her surgeries until she sought treatment from Dr. Mellies on June 29, 2004. Kelley v. Barnhart, 372 F.3d 958, 961 (8th Cir. 2004) ("Infrequent treatment is also a basis for discounting a claimant's subjective complaints."). Claimant waited to seek medical treatment again until February 8, 2005, at the direction of counsel. See Johnson v. Chater, 108 F.3d 942, 947 (8th Cir. 1997) (determining that failing to seek treatment was inconsistent with claimant's subjective complaints of disabling pain); Chamberlain v. Shalala, 47 F.3d 1489, 1495 (8th Cir. 1995) (failure to seek aggressive medical care is not suggestive of disabling pain); Walker v. Shalala, 993 F.2d 630, 631-32 (8th Cir. 1993) (lack of ongoing treatment is inconsistent with complaints of disabling condition). Likewise, the

medical evidence is devoid of any evidence showing that Claimant's condition has deteriorated or required aggressive medical treatment although Claimant testified otherwise at the hearing. See Id.; Ply v. Massanari, 251 F.3d 777, 779 (8th Cir. 2001) (noting a claimant's inconsistent statements as a factor to consider in determining claimant's credibility).

The ALJ further noted that Claimant takes over-the-counter medications for pain, not narcotic pain relievers. See Masterson v. Barnhart, 363 F.3d 731, 739 (8th Cir. 2004) (ALJ properly considered that claimant did not take narcotic pain medication in finding her complaint of extreme pain not credible); Rankin v. Apfel, 195 F.3d 427, 430 (8th Cir. 1999); Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996) (holding that pain which can be remedied or controlled with over-the-counter analgesics normally will not support a finding of disability). Further, the ALJ noted how by her own admission, Claimant is able to engage in household chores and activities including working ten hours per week. Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997) ("The ALJ may discount subjective complaints of physical and mental health problems that are inconsistent with medical reports, daily activities, and other such evidence."). In particular, the ALJ found that Claimant's activities, "especially taking care of two young children, working part-time five days per week, and driving an automobile, are considered to be more than minimal and indicate that the claimant has mental and physical stamina and the ability to concentrate and use her arms and legs." (Tr. 16-17). The ALJ opined these to be more than minimal activities. See Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996) (affirming ALJ's discount of claimant's subjective complaints of pain where claimant was able to care for one of his children on a daily basis, drive car infrequently, and go grocery shopping occasionally). These observations are supported by substantial evidence on the record as a whole.

As demonstrated above, a review of the ALJ's decision shows the ALJ not to have denied relief solely on the lack of objective medical evidence to support his finding that Claimant is not disabled. Instead, the ALJ considered all the evidence relating to Claimant's subjective complaints, including the various factors as required by Polaski, and determined Claimant's allegations not to be credible. Although the ALJ did not explicitly discuss each Polaski factor in making his credibility determination, a reading of the decision in its entirety shows the ALJ to have acknowledged and considered the factors before discounting Claimant's subjective complaints. See Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1996). Inasmuch as the ALJ expressly considered Claimant's credibility and noted numerous inconsistencies in the record as a whole, and the ALJ's determination is supported by substantial evidence, such determination should not be disturbed by this Court. Id.; Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996). Because the ALJ gave multiple valid reasons for finding Claimant's subjective complaints not entirely credible, the undersigned defers to the ALJ's credibility findings. See Leckenby v. Astrue, 487 F.3d 626, 632 (8th Cir. 2007) (deference given to ALJ's credibility determination when it is supported by good reasons and substantial evidence); Guilliams v. Barnhart, 393 F.3d 798, 801(8th Cir. 2005).

The undersigned finds that the ALJ considered Claimant's subjective complaints on the basis of the entire record before him and set out the inconsistencies detracting from Claimant's credibility. The ALJ may disbelieve subjective complaints where there are inconsistencies on the record as a whole. Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990). The ALJ pointed out inconsistencies in the record that tended to militate against the Claimant's credibility. See Guilliams, 393 F.3d at 801 (deference to ALJ's credibility determination is warranted if it is supported by good reasons and substantial evidence). Those included Claimant's minimal, ongoing

treatment for pain, her lack of functional restrictions by any physicians, her daily activities, low earning history, and lack of pain medications. The ALJ's credibility determination is supported by substantial evidence on the record as a whole, and thus the Court is bound by the ALJ's determination. See Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006); Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992). Accordingly, the ALJ did not err in discrediting Claimant's subjective complaints. See Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001) (affirming the ALJ's decision that claimant's complaints of pain were not fully credible based on findings, inter alia, that claimant's treatment was not consistent with amount of pain described at hearing, that level of pain described by claimant varied among her medical records with different physicians, and that time between doctor's visits was not indicative of severe pain).

To the extent Claimant contends that the ALJ failed to take into account the evaluation of Dr. Levy, the Court finds that the record demonstrates that Claimant did not submit Dr. Levy's report in the record until after the ALJ issued his decision. The record shows that Dr. Levy examined Claimant on November 8, 2005, and issued his report on December 4, 2005, and the ALJ issued his decision on September 22, 2005. (Tr. 11-21, 274-77). Nonetheless, the instant record supports the ALJ's finding of no symptomology involving Claimant's left arm and shoulder including a physical therapy evaluation demonstrating normal motor strength and range of motion, and the lack of medical evidence showing Claimant complained of ongoing left arm or shoulder pain. Likewise, Dr. Levy rendered his opinions of disability after a one-time evaluation. See Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000)(opinion of consulting physician who examines claimant once generally does not constitute substantial evidence); cf. Holmstrom v. Massanari, 270 F.3d 715, 721 (8th Cir. 2001)(treating physician's vague and conclusory opinion is not entitled to

deference).  A review of the record shows no substantive evidence to support his opinions, and his report is inconsistent with the medical evidence on record as well as his own examination notes. Dr. Levy's examination of Claimant revealed that she had a full range of motion with no discomfort of any joints in her left arm and negative Tinel's sign.  Further, the Appeals Council considered Dr. Levy's report and determined that it would not change the outcome of the ALJ's decision.  (Tr. 5-7).

For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the record as a whole.  Inasmuch as there is substantial evidence to support the ALJ's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case differently.  Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001); Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992).  Accordingly, the decision of the ALJ denying Claimant's claims for benefits should be affirmed.

B.      The ALJ's Residual Functional Capacity Assessment

Claimant argues that the ALJ erred in determining a residual functional capacity not based upon all of the medical evidence.

At step three of the evaluation process the ALJ found that the Claimant has right shoulder strain, right arm palsy, and bilateral carpal tunnel syndrome, status-post surgery for release, but that they do not meet or equal a listed impairment.  At step four, the ALJ found that the Claimant is able to perform work except for work involving frequently lifting over ten pounds or occasionally lifting over twenty pounds, and that Claimant's allegations of disabling symptoms precluding all substantial gainful activity are inconsistent with the evidence on the record and not

credible.  See 20 C.F.R. § 404.1545 (defining RFC as "the most [a claimant] can still do despite" his "physical or mental limitations.")  The ALJ found that the Claimant retains the residual functional capacity ("RFC")to perform work except for work involving frequently lifting over ten pounds or occasionally lifting over twenty pounds.  The ALJ found that Claimant is only able to use one of her arms to perform work activities, but she has no other exertional or nonexertional limitations.  Thus, the ALJ determined that the Claimant is able to perform a wide range of light work.

"The ALJ must determine a claimant's RFC based on all of the relevant evidence." Fredrickson v. Barnhart, 359 F.3d 972, 976 (8th Cir. 2004).  It is the responsibility of the ALJ to assess a claimant's RFC based on all the evidence, including medical records, the opinions of treating and examining physicians, as well as the claimant's own statements regarding his limitations.  McGeorge v. Barnhart, 321 F.3d 766, 768 (8th Cir. 2003); McKinney v. Apfel, 228 F.3d 860 863 (8th Cir. 2000) (citing Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)).  "In analyzing the evidence, it is necessary to draw meaningful inferences and allow reasonable conclusions about the individuals's strengths and weaknesses."  SSR 85-16.  SSR 85-16 further delineates that "consideration should be given to ... the [q]uality of daily activities ... [and the a]bility to sustain activities, interests, and relate to others *over a period of time*" and that the "frequency, appropriateness, and independence of the activities must also be considered."  SSR 85-16.

An ALJ must begin his assessment of a claimant's RFC with an evaluation of the credibility of the claimant and assessing the claimant's credibility is primarily the ALJ's function.  See Anderson v. Barnhart, 344 F.3d 809, 815 (8th Cir. 2003) (finding a claimant's credibility is

primarily a matter for the ALJ to decide); Pearsall, 274 F.3d at 1218. In making a credibility

determination, an ALJ may discount subjective complaints if they are inconsistent with the record

as a whole. Holstrom v. Massanari, 270 F.3d 715, 721 (8th Cir. 2001) ("The credibility of a

claimant's subjective testimony is primarily for the ALJ to decide, not the courts."); Polaski v.

Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). In Polaski, the Eighth Circuit set out factors for an

ALJ to consider when determining the credibility of a Claimant's subjective complaints. The ALJ

must consider all of the evidence presented, including the claimant's prior work record and

observations by third parties and treating and examining physicians as to:

1.     the claimant's daily activities;

2.     the duration, frequency and intensity of the pain;

3.     any precipitating and aggravating factors;

4.     dosage, effectiveness and side effects of medication; and

5.     any functional restrictions.

Polaski, 739 F.2d at 1322. The ALJ must make express credibility determinations detailing the

inconsistencies in the record that support the discrediting of the claimant's subjective complaints.

Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000). See also Johnson v. Secretary of Health and

Human Servs., 872 F.2d 810, 813 (8th Cir. 1989); Ghant v. Bowen, 930 F.2d 633, 637 (8th Cir.

1991). "An ALJ must do more than rely on the mere invocation of Polaski to insure safe passage

for his or her decision through the course of appellate review." Harris v. Shalala, 45 F.3d 1190,

1193 (8th Cir. 1995). However, the Eighth Circuit has held that an ALJ is not required to discuss

each Polaski factor methodically. The ALJ's analysis will be accepted as long as the opinion

reflects acknowledgment and consideration of the factors before discounting the claimant's

subjective complaints.  <u>Lowe v. Apfel</u>, 226 F.3d 969, 972 (8th Cir. 2000).  <u>See</u> <u>also</u> <u>Brown v.</u>

<u>Chater</u>, 87 F.3d 963, 966 (8th Cir. 1996).  An ALJ is only required to consider impairments he

finds credible and supported by substantial evidence in determining a claimant's RFC.  <u>See</u>

<u>McGeorge v. Barnhart</u>, 321 F.3d 766, 769 (8th Cir. 2003) ("The ALJ properly limited his RFC

determination to only the impairments and limitations he found to be credible based on his

evaluations of the entire record." )

      The ALJ's determination of the Claimant's RFC is supported by substantial evidence in the

record.  The ALJ properly evaluated the medical evidence in the record, and opined that the

medical evidence diminishes Claimant's credibility.  The ALJ noted that Claimant did not seek

sustained and regular medical treatment for any of her symptoms.  In particular, the ALJ noted

how Claimant reported to Dr. Tsao-Wu no reoccurrence of finger numbness and doing well with

no significant complaints after carpal tunnel release surgery.  The ALJ also noted that thereafter,

Claimant has not received ongoing medical attention or treatment for her upper extremities after

recovering from her surgeries until she sought treatment from Dr. Mellies on June 29, 2004.  The

records shows that Claimant waited to seek medical treatment again until February 8, 2005, at the

direction of counsel.

      The ALJ further noted that the record is devoid of any physician finding or imposing any

physical limitations upon Claimant's functional capacity.  The ALJ opined that Claimant's

assertions regarding the intensity and frequency of symptoms are inconsistent with Claimant's

infrequent  history of treatment.  The ALJ also properly considered the <u>Polaski</u> factors in

concluding that "claimant lacks credibility in other respects."  (Tr. 13).  The ALJ listed facts from

the Claimant's hearing testimony regarding the <u>Polaski</u> factors that reflected upon the Claimant's

ability to perform past relevant work such as her ability to drive an automobile, to care for her young children, and to work part-time. Further, the ALJ pointed out other inconsistencies in the record that tended to militate against Claimant's credibility. Those included Claimant's gap in medical treatment, her testimony regarding her daily activities, the absence of objective medical evidence of deterioration, the ability to engage in part-time work, the absence of any doctor finding Claimant disabled or imposing any functional limitations, and her daily activities. Based on the ALJ's analysis of the medical evidence and Claimant's credibility, the undersigned finds that there exists in the record substantial evidence to support a finding that the Claimant retains an RFC to perform a wide range of light work. See Stormo v. Barnhart, 377 F.3d 801, 807 (8th Cir. 2004) (in determining residual functional capacity, ALJ must consider medical records, observations of treating physicians and others, and claimant's own descriptions of her limitations; hypothetical is sufficient if it sets forth impairments supported by substantial evidence and accepted as true by ALJ). The ALJ's determination does not contradict any of the medical evidence, and nothing else in the record detracts from his decision. Notably, Claimant was free to provide evaluations supporting his contentions. See 20 C.F.R. § 404.1512(c) ("Your responsibility.... You must provide evidence show how your impairment(s) affects your functioning during the time you say that your are disabled, and any other information that we need to decide your case."); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004) ("A disability claimant has the burden to establish [his] RFC.").

For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the record as a whole. Inasmuch as there is substantial evidence to support the ALJ's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that

would have supported a contrary outcome or because another court could have decided the case differently.  Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001); Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992).   Accordingly, the decision of the ALJ denying Claimant's claims for benefits should be affirmed.

Therefore, for all the foregoing reasons,

**IT IS HEREBY ORDERED** that the decision of the Commissioner be affirmed and that Claimant's complaint be dismissed with prejudice.

Dated this  25th  day of September, 2007.

/s/ Terry I. Adelman
UNITED STATES MAGISTRATE JUDGE